# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

|  |  |
|---|---|
| SURESOURCE COMMODITIES, LLC, | CASE NO. 5:23-cv-1039 |
| Plaintiff, |  |
|  | MAGISTRATE JUDGE AMANDA M. KNAPP |
| vs. |  |
| GRANITE RIDGE FARM, LLC, and STEVEN MAST, | **MEMORANDUM OPINION AND ORDER** |
| Defendants. |  |

Pending before the Court is a Motion for Summary Judgment ("Motion") filed by Defendants Granite Ridge Farm, LLC ("Granite Ridge") and Steven Mast ("Mr. Mast") (collectively "Defendants") pursuant to Fed. R. Civ. P. 56.  (ECF Doc. 48.)  The Motion is fully briefed and ripe for decision.  (ECF Docs. 50, 54.)  The parties have consented to the magistrate judge pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  (ECF Docs. 12, 13.)  For the reasons set forth below, the Court **DENIES** the Motion.

## I. Background

### A. Procedural History

Plaintiff SureSource Commodities, LLC ("SureSource" or "Plaintiff") filed its Complaint against Defendants on May 22, 2023.  (ECF Doc. 1.)  Defendants filed an Answer on July 21, 2023.  (ECF Doc. 9.)  SureSource filed an Amended Complaint on August 31, 2023.  (ECF Doc. 23 ("Complaint").)  SureSource seeks compensatory damages, including attorney's fees and costs in Counts One (breach of contract) and Two (promissory estoppel) against Defendants jointly and severally.  (Compl., pp. 2-5, ¶¶ 8-23.)  Defendants filed an Answer to the Amended Complaint on September 1, 2023.  (ECF Doc. 25 ("Answer").)

1

Defendants filed the instant Motion on May 2, 2024, seeking summary judgment on all counts.  (ECF Doc. 48.)  Specifically, they assert that no contract existed between the parties as a matter of law, that Defendants did not make a clear and unambiguous promise upon which Plaintiff reasonably relied to its detriment, and that Plaintiff failed to mitigate damages.  (ECF Doc. 48-1, pp. 5, 9-15.)  Plaintiff asserts that there exists a genuine issue of material fact as to each element of its claim.  (ECF Doc. 50, pp. 23-24.)

**B.      Factual Background**[1]

SureSource is a buyer and seller of organic grain and feed products.  (ECF Doc. 47-1 (Deposition of Barbara VanDerWal, "VanDerWal Depo."), 49:2-6.)  It is owned and run by its founder and president, Barbara VanDerWal ("Ms. VanDerWal" (fka Barbara McGillivray)).  (*Id.* at 12:3-5, 68:21-69:2; ECF Doc. 50-2 (Affidavit of Barbara VanDerWal, "VanDerWal Aff."), p. 1, ¶ 1.)  Ms. VanDerWal is an experienced grain commodities trader.  (VanDerWal Depo., 35:13-15.)  In her capacity as president of SureSource, she buys and sells grain commodities on the open market and sells grain feed, including extruded organic soybean meal to farmers.  (*Id.* at 33:2-35:22, 49:5-50:22).)

Organic soy products (soybean meal, soybean oil) make up 58% of SureSource's business.  (*Id.* at 51:5-8.)  To produce soybean meal, whole soybeans go through an extrusion process that crushes the soybeans and extracts oil, creating soybean meal at the same time.  (*Id.* at 49:11-19.)  SureSource does not extrude its own soybeans, but contracts with a third party to extrude the soybeans into soybean meal and soybean oil.  (*Id.* at. 33:17-24, 49:11-19.)

---

[1] In their reply brief, Defendants ask that an affidavit from Plaintiff's attorney and attached letters between counsel be stricken or disregarded as irrelevant and inadmissible under Fed. R. Evid. 408.  (ECF Doc. 54, pp. 14-15 (referencing ECF Doc. 50-3).)  As the Court denies the Motion without reference to these disputed documents, it need not address their admissibility or whether they should be stricken from the record at this time.

Granite Ridge is a poultry farm primarily in the business of producing, grading, and selling organic eggs.  (ECF Doc. 48-2 (Affidavit of Steven Mast, "Mast Aff."), p. 1, ¶ 2.)  It is owned solely by Mr. Mast.  (ECF Doc. 49-1 (Deposition of Steven Mast, "Mast Depo."), 10:11-13.)  Granite Ridge has about 100,000 chickens laying an average of 85,000 eggs a day.  (*Id*. at 16:11-13, 23:23-24:4.)  These eggs are graded and sold to a marketing company that then sells them to retailers.  (*Id*. at 27:3-12.)

Granite Ridge purchases corn, soybean meal, and other ingredients to create a feed mix for its chickens.  (*Id*. at 18:18-19:3; Mast Aff., p. 1, ¶ 3.)  The company buys its corn and soybean meal from multiple producers.  (Mast Depo., 44:7-45:1, 46:13-19.)  In 2022, the company bought 3,000 to 4,000 tons of organic soybean meal and 250,000 bushels of corn.  (*Id.* at 36:5-37:4.)  Most of the corn and soybean meal is used to feed Granite Ridge chickens, but in recent years, the company has also sold its mixed feed to other chicken farms as an ancillary business.  (*Id.* at 19:4-14, 36:7-12; Mast Aff., p. 1, ¶ 4.)  The sale of feed products constitutes 10-15% of Granite Ridge's business.  (Mast Depo., 31:10-17.)  Mr. Mast handles all large purchasing orders for Granite Ridge.  (*Id.* at 35:1-11.)

In early 2022, Granite Ridge learned that Handsome Brook Farms ("HBF"), another producer of organic eggs, wanted to purchase mixed feed for its chickens.  (Mast Aff., p. 1, ¶ 5.)  In hopes of being able to sell mixed feed to HBF, Mr. Mast, on behalf of Granite Ridge, began seeking quotes from multiple sellers of organic soybean meal, one of which was SureSource.  (*Id.* at pp. 1-2, ¶¶ 7, 9.)  Granite Ridge had never communicated with, purchased from, or done business with SureSource or Ms. VanDerWal prior to April 2022.  (*Id.* at p. 2, ¶12; *see also* VanDerWal Depo., 83:22-84:4.)

The contract at issue here was allegedly formed through oral communications between Mr. Mast and Ms. VanDerWal on or about July 7 and July 8, 2022.  (Compl., p. 3, ¶¶ 10-12.)

### 1.     Communications Between the Parties Before July 7, 2022

On April 27, 2022, Ms. VanDerWal and Mr. Mast spoke on the telephone for the first time.  (Mast Aff., p. 2, ¶ 10.)  At this time, Mr. Mast was not trying to buy soybean meal for Granite Ridge's own use; he was contacting suppliers of soybean meal solely in anticipation of a potential contract to sell finished feed mix to HBF.  (Mast Depo., 51:16-52:6.)  SureSource was one of four suppliers from which Mr. Mast sought quotes for organic soybean meal.  (*Id.* at 79:8-10.)  During their first telephone call, Mr. Mast and Ms. VanDerWal discussed Granite Ridge's operations, and Mr. Mast requested a quote for soybean meal for "a potential new customer"; he did not mention HBF by name.  (*Id.* at 62:16-63:16.)  Following the call, Ms. VanDerWal sent Mr. Mast an email summarizing their discussion.  (*Id.* at 65:14-66:5; Mast Aff., p. 2, ¶ 11; ECF Doc. 48-2, p. 7.)  She said she would send Mr. Mast an "offer" once she obtained information on delivery rates to Smithville, Ohio.  (ECF Doc. 48-2, p. 7.)

On April 29, 2022, Ms. VanDerWal emailed Mr. Mast a quote for organic soybean meal at $1,745 USD/ton at up to 600 tons.  (Mast Aff., p. 2, ¶ 13; ECF Doc. 48-2, p. 8.)  She expressly called this quote an "offer."  (*Id.*)  The quote/offer was valid until May 4, 2022.  (*Id.*)  Mr. Mast did not respond to the offer because he did not receive a commitment from HBF to buy mixed feed, and it lapsed.  (Mast Aff., p. 2, ¶ 14; Mast Depo., 70:2-21.)

On June 30, 2022, Mr. Mast emailed Ms. VanDerWal, requesting a quote for soybean meal in Q4 (fourth quarter) at three loads per week.  (Mast Aff., p. 2, ¶ 15; ECF Doc. 48-2, p. 9.)  On July 4, 2022, Ms. VanDerWal responded with an email "offer" for soybean meal at $1,625 USD/ton at a volume of 1 railcar or 95 tons per week and soybean oil at $0.75 USD/pound,

4

volume to be determined.  (*Id.*)  Both quotes remained open until the end of the day on July 6,

2022.  (*Id.*)  Mr. Mast did not respond to the email, and the quotes lapsed.  (Mast Aff., p. 2, ¶17).

### 2.  Communications Between the Parties on July 7 and July 8, 2022

The parties spoke on the telephone multiple times and exchanged multiple text messages

and emails on July 7 and 8, 2022.  At their depositions, neither Mr. Mast nor Ms. VanDerWal

could recall exactly what was said on specific dates but testified to their recollection of the

summation of their phone conversations on July 7 and 8, 2022.  The content of these

conversations is where the greatest factual dispute lies.  Thus, the Court will summarize the

disputed contents of their phone conversations separately from the undisputed communications.

### i.  Undisputed Communications

According to Ms. VanDerWal's telephone records, she called Mr. Mast on the phone at

11:36 am on July 7, 2022, and they spoke for 13 minutes.   (ECF Doc. 49-6, p. 6; VanDerWal

Depo., 122:11-16 (confirming that these phone records show calls made to Mr. Mast).)  At 11:56

am, Mr. Mast emailed Ms. VanDerWal the following message: "Per our conversation, we are

looking at somewhere between 1,600 and 2,000 tons for Q4 and between 5,000 and 6,500 tons

for 2023.  I should have more definite numbers by the end of the month[.]"  (Mast Aff., p. 2, ¶

18; ECF Doc. 48-2, p. 10).  Ms. VanDerWal called Mr. Mast again at 12:11 pm on July 7, 2022,

and they spoke for about eight minutes.  (ECF Doc. 49-6, p. 6.)

At 2:44 pm that same day, Ms. VanDerWal sent the following text message to Mr. Mast:

"Hi Steven! I was able to negotiate with the supplier and get the price to $1538/Ton . . . . What

volume should I put? What about soybean oil?"  (Mast Aff., p. 3, ¶ 19; ECF Doc. 48-2, p. 11.)

Ms. VanDerWal sent a follow-up email to Mr. Mast at 3:46 pm, re-stating the new price quote,

asking for confirmation of volume for Q4, and suggesting they wait for "Q1 forward to book."

(Mast Aff., pp. 3-4, ¶¶ 23-25; ECF Doc. 48-2, p. 13.)

The parties exchanged the following texts at 3:50 pm on July 7:

Mr. Mast: Barbara, now that's what you call service! That was quick! I need to have some final answers from HBF on my end. We're currently trying to make our schedules work to meet. I'll keep you posted.

Ms. VanDerWal: Great! Can you let me know by tomorrow? I'm going on vacation for a week.

(ECF Doc. 48-2, p. 11.)

On July 8, 2022, at 10:53 am, Mr. Mast and Ms. VanDerWal spoke on the phone for six minutes.  (ECF Doc. 49-6, p. 7.)  At 11:49 am, Mr. Mast emailed Ms. VanDerWal, asking her to send a sample of soybean meal to Granite Ridge.  (ECF Doc. 48-2, p. 13.)  Later that day, at 3:31 pm, Ms. VanDerWal sent Mr. Mast an email indicating that her office would be coordinating the shipment of a sample for testing ("July 8 email").  (*Id.* at p. 12.)  This email also stated: "Please see attached contract. Please review, sign, and date at your earliest convenience. Thanks for your business! It means a great deal to me and my team!"  (*Id.*)  Ms. VanDerWal attached a document labeled "Sales Contract - Flat" to her email ("Sales Contract Confirmation").  (VanDerWal Aff., p. 2, ¶ 5; ECF Doc. 23-1.)  Mr. Mast did not review the attached document at that time.  (Mast Aff., p. 3, ¶ 24.)  He testified he did not read the Sales Contract Confirmation until around August 31, 2022.  (Mast Depo. at 102:12-17.)

The Sales Contract Confirmation stated that SureSource would supply Granite Ridge with 1,600 to 2,000 tons of soybean meal at $1,538.00 USD/ton.  (ECF Doc. 23-1, p. 1.)  It provided for delivery between October 1, 2022 and December 31, 2022.  (*Id.*)  It also included the following language: "BUYER'S OPTION TO REJECT CONTRACT BY JULY 22, 2022.  IF NOT REJECTION, THIS CONTRACT IS VALID.  WITH REJECTION IN WRITING FROM BUYER, THIS CONTRACT IS NULL & VOID."  (*Id.*)  The terms and conditions accompanying the contract indicate that the

6

National Grain and Feed Association ("NGFA") trade rules govern and that Granite Ridge would be responsible for SureSources's legal fees in the event of a breach.  (*Id.* at 2.)

### ii.    Disputed Communications

Mr. Mast testified at his deposition that Ms. VanDerWal was "very pushy trying to get the sale done" during their telephone calls on July 7 and 8, 2022.  (Mast Depo., at 79:7-8, 85:3-21.)  He confirmed she was one of four suppliers he had contacted about purchasing soybean meal to make feed for HBF.  (*Id.* at 80:16-22.)  He said he told each supplier, including SureSource, that he was calling about "a potential new customer" and that he would "not commit to anything" until obtaining commitments "on [his] end."  (*Id.* at 79:8-14.)  Mr. Mast testified that he did not have commitments from HBF on July 7, 2022, so he was "not promising anything."  (*Id.* at 79:17-21.)  He said HBF did not give him a specific price point, so he did not give potential soybean meal suppliers a price range; but he did tell Ms. VanDerWal that $1,625/ton was too high.  (*Id.* at 74:12-75:11.)  Mr. Mast further testified that Ms. VanDerWal, asked if the $1,538/ton price she quoted him was a good price during one of their phone calls.  (*Id.* at 81:12-15, 83:7-10, 85:12-18.)  He agreed it was but said he would not sign anything without hearing from HBF.  (*Id.*)  At the end of their telephone conversations, Mr. Mast said that Ms. VanDerWal told him she would send him a "quote," and it would be good for ten days so he could have time to decide what he wanted to do.  (*Id.* at 81:25-82:5.)

At her deposition, Ms. VanDerWal testified that Mr. Mast told her he needed a price around $1,538/ton during their conversations on July 7 and 8, 2022.  (VanDerWal Depo., 79:17-18.)  She said she and Mr. Mast "talked about agreeing to the range of volume, because he didn't know specifically what he was going to get from [HBF]. And then he wanted to have a window of opportunity to get out of the contract in case they didn't confirm[.]"  (*Id.* at 79:21-25; *see also id.* at 93:1-22.)  When asked whether Mr. Mast told her at any time that he had a deal with HBF,

Ms. VanDerWal said "No. He told me that he wanted a window of opportunity to get out in case

they did not confirm." (*Id.* at 80:1-4.)  When asked if Mr. Mast ever told her he did *not* have a

firm deal with HBF, Ms. VanDerWal said she was "pretty sure" he did not say that specifically.

(*Id.* at 80:21-81:3.)  At the end of their telephone conversation on July 8, she testified that Mr.

Mast "had a deal with [her]." (*Id.* at 80:8; *see also id.* at 119:15-18 ("I did not choose to send

him a contract unilaterally. . . . We agreed to it verbally."))  She claims that she and Mr. Mast

agreed to the following contract terms during the July 8 telephone call: a volume of 1,600 to

2,000 tons of soybean meal at $1,538/ton, delivery to occur during the fourth quarter of 2022,

and a 14-day term for Granite Ridge to revoke acceptance of the contract.  (VanDerWal Aff., pp.

1, ¶ 3, 3-4, ¶¶ 15-16.)

### 3.  Communications Between the Parties After July 8, 2022

On July 20, 2022, Ms. VanDerWal called Mr. Mast and left a message, asking him to

return her call.  (Mast Aff., p. 4, ¶ 27; ECF Doc. 49-6, p. 9.)

On July 25, 2022, Mr. Mast and Ms. VanDerWal exchanged the following text messages:

> Mr. Mast: Hey Barbara, sorry for not getting back to you. I'm not trying to ignore
> you.  Last week, our grader ran into some major issues on top of that my plant
> manager had hip surgery last week so I'm covering for him as well. I have to get
> caught up on grading eggs before I can get focused on anything else.

> Ms. VanDerWal: Ok no worries!

(Mast Aff., p. 4, ¶¶ 28-29; ECF Doc. 48-2, p. 17.)  Ms. VanDerWal testified that she considered

this conversation to relate solely to Ms. Mast's failure to return her July 20 call.  (VanDerWal

Depo., 120:23-122:5.)

Mr. Mast emailed Ms. VanDerWal on August 4, 2022, to advise her that he was

"[s]tarting to catch up again. Hoping to jump back on the bean meal next week." (Mast Aff., p.

4, ¶¶ 30-31; ECF Doc. 48-2, p. 18.)  He requested a quote for soybean oil and a delivery date,

which Ms. VanDerWal provided.  (*Id.*)  Neither party mentioned the alleged contract for soybean meal at that time.

Ms. VanDerWal texted Mr. Mast again on August 31, 2022, asking him to send her the signed Sales Contract Confirmation.  (Mast Aff., pp. 4-5, ¶¶ 32-36; ECF Doc. 48-2, p. 19.)  The following text conversation ensued:

> Mr. Mast: I was never able to get any volume committed from our potential customer for within that time frame. Supposedly, they are getting that to us next week. I'm just not comfortable committing to anything until I have my bases covered.
>
> Ms. VanDerWal: I booked the volume and we discussed that you had until the 28th of last month to get out of it. I hope they confirm because I booked the beans.
>
> Mr. Mast: Obviously we had a misunderstanding, I was on the meaning that I needed to sign the agreement by the end of the month (or whenever the date was) in order for the quote to be valid and if I don't sign and send back the offer within the time frame it's null and void. I didn't sign it because I didn't have any answers on my end yet.

(*Id.* at pp. 19-20.)  Ms. VanDerWal attached a copy of the Sales Contract Confirmation to her next message and stated:

> How can there be any confusion surrounding this? It is clearly highlighted green on the contract. It was your duty to communicate to me if you rejected the contract in writing by July 22. I had tried to reach out to you multiple times to confirm which direction you would like to proceed and you would respond to me [sic]. Where do we go from here?

(*Id.* at pp. 21-22.)

Ms. VanDerWal and Mr. Mast communicated further about the alleged contract by text on September 15, 2022, with Mr. Mast insisting he never meant to enter a binding contract, and Ms. VanDerWal indicating that she "drafted the contract as [they] had discussed."  (Mast Aff., pp. 5-6, ¶¶ 42-43; ECF Doc. 48-2, pp. 23-26.)  Mr. Mast told Ms. VanDerWal that as of

September 15, 2022, Granite Ridge had not "mixed a single batch" for HBF, and he "still [did not] have any volumes." (ECF Doc. 48-2, p. 24.)

Granite Ridge ultimately did mix and sell grain feed to HBF in September 2022, using soybean meal previously purchased from another supplier. (Mast Depo., 61:24-62:9.) In November 2022, Granite Ridge contracted with another supplier to purchase "a very small amount" of soybean meal to cover their needs for the rest of the year and to mix feed to sell to HBF. (*Id.* at 77:14-78:25.)

On November 4, 2022, Marissa Uzonyl, an administrative assistant at SureSource, emailed Mr. Mast asking him to sign and return the Sales Contract Confirmation at his "earliest convenience." (Mast Aff., p. 6, ¶ 45; ECF Doc. 48-2, p. 28.)

## II.    Standard of Review

Rule 56 of the Federal Rules of Civil Procedure requires the court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. The movant therefore "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett¸* 477 U.S. 317, 323 (1986) (internal quotations omitted).

After the moving party has carried its initial burden to show that there are no genuine issues of material fact in dispute, the burden shifts to the non-moving party to present specific facts that demonstrate there is a genuine issue of material fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "[I]nferences to be drawn from the

10

underlying facts must be viewed in the light most favorable to the party opposing the motion." *Id.* at 587 (internal quotations, citations, and alterations omitted).

The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]"  *Scott v. Harris*, 550 U.S. 372, 380 (2007) (internal quotations omitted).  Rather, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   In determining whether summary judgment is warranted, a judge generally asks, "whether there is evidence upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed."  *Id.* at 252 (internal citations, emphasis, and bracket omitted).  If, however, "the evidence is merely colorable or is not significantly probative," summary judgment for the movant is proper.  *Tokmenko v. MetroHealth Sys.*, 488 F. Supp. 3d 571, 576 (N.D. Ohio 2020) (citing *Anderson*, 477 U.S. at 250); *see Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) ("The 'mere possibility' of a factual dispute is not enough.").

### III.    Analysis

### A.    Count One: Breach of Contract

In seeking summary judgment on the breach of contract claim, Defendants argue primarily that Plaintiff cannot show a genuine dispute of material fact as to whether there was a "meeting of the minds" on the contract terms, and that the claim must also fail because Mr. Mast did not sign a written contract.  (ECF Doc. 48-1, pp. 13-16; ECF Doc. 54, pp. 6-10, 12.)  Plaintiff argues in response that the deposition testimony and documentary evidence support a finding that the parties entered an enforceable contract, with a meeting of the minds, when they orally agreed to contract terms that were later reduced to writing in the Sales Contract Confirmation. (ECF Doc. 50, pp. 14-15.)  Plaintiff further argues that Mr. Mast's signature was not needed on a

11

written contract under the "merchant exception" to the statute of frauds.  (*Id.* at pp. 15-17 (citing O.R.C. §§ 1302.01(A)(5), 1302.04(B)).)  The parties also make arguments regarding the applicability of the NGFA Trade Rules, whether the alleged contract was breached, and damages.  (ECF Doc. 48-1, pp. 17-19; ECF Doc. 50, pp. 17-22; ECF Doc. 54, pp. 10-11, 13-14.)

To prove a breach of contract claim, a plaintiff must show "the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff." *Doner v. Snapp*, 98 Ohio App.3d 597, 600 (Ohio Ct. App. 1994).  Where the claim arises out of an alleged contract to purchase goods, like soybean meal, Article 2 of the Uniform Commercial Code, as adopted by Ohio ("Ohio Commercial Code" or "OCC"), governs.  *See* O.R.C. §§ 1301(8) (defining "goods"), 1302.02; *see also Energy Mktg. Servs., Inc. v. Homer Laughlin China Co.*, 186 F.R.D. 369, 374 (S.D. Ohio 1999), *aff'd*, 229 F.3d 1151 (6th Cir. 2000) ("In Ohio, the Uniform Commercial Code, as codified by the Ohio Commercial Code, governs contracts for the sale of goods."), *aff'd*, 229 F.3d 1151 (6th Cir. 2000).  Under the OCC's statute of frauds, a contract for the sale of goods at a price of $500 or more is not enforceable "unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker."  O.R.C. § 1302.04(A).

Here, there is no dispute that the alleged contract—for the sale of 1,600 to 2,000 tons of soybean meal at $1,583/ton—pertained to a sale of goods that was governed by the OCC and subject to the applicable statute of frauds.  It is also undisputed that that Mr. Mast did not sign the written document documenting the contract terms, the Sales Contract Confirmation.  (*See* ECF Doc. 23-1.)  Nevertheless, for the reasons set forth below, the Court finds that Plaintiff has presented sufficient evidence to demonstrate facts which, if taken as true and construed in the

12

light most favorable to Plaintiff, would allow a jury to conclude that the parties entered an oral contract for the sale of organic soybean meal, and to find that the "merchant exception" to the statute of frauds applies to satisfy the general requirement for a signed, written contract.

### 1. Plaintiff Has Demonstrated a Genuine Dispute of Material Fact as To Whether There Was a Meeting of the Minds on an Oral Contract

To establish the existence of a contract, a plaintiff must show that both parties consented to the terms of the contract, that there was a "meeting of the minds" between both parties, and that the terms of the contract are definite and certain. *McSweeney v. Jackson*, 117 Ohio App.3d 623, 631 (Ohio Ct. App. 1996). "[A] meeting of the minds occurs if 'a reasonable person would find that the parties manifested a present intention to be bound to an agreement.'" *PNC Bank, N.A. v. Springboro Med. Arts, Inc.*, 2015-Ohio-3386, ¶ 22 (quoting *Champion Gym & Fitness, Inc. v. Crotty,* 178 Ohio App.3d 739, 743 (Ohio Ct. App. 2008) (quoting *Zelina v. Hillyer,* 165 Ohio App.3d 255, 259 (Ohio Ct. App. 2005))).

"Whether there has been a manifestation of mutual assent and/or a meeting of the minds is a question of fact to be determined from all the relevant facts and circumstances." *Costner Consulting Co. v. U.S. Bancorp*, 195 Ohio App. 3d 477, 482-83 (Ohio Ct. App. 2011) (citing *Matusoff & Assoc. v. Kuhlman*, 2000 WL 192449 (Ohio Ct. App. Sept. 28, 1999); *Ginn v. Horn*, 1987 WL 9631 (Ohio Ct. App. Apr. 7, 1987)). Therefore, Ohio courts have reversed entries of summary judgment "when issues of fact concerning the existence of a contract remained." *Id.* (citing *Gutbrod v. Schuler,* 2010-Ohio-3731 (Ohio Ct. App. Aug. 12, 2010); *Williams v. Worthington Cylinder Corp.*, 1995 WL 656915 (Ohio Ct. App. Nov. 7, 1995); *Source Servs. Corp. v. Capital Data Sys., Inc.*, 1990 WL 95371 (Ohio Ct. App. July 10, 1990)).

Here, Defendants argue that Plaintiff cannot show a meeting of the minds because Mr. Mast did not intend to enter a contract before obtaining a commitment from HBF and did not

accept the Sales Contract Confirmation's terms by signing it, and because none of Mr. Mast's emails can be construed as accepting Ms. VanDerWal's July 8, 2022 email "offer."[2]  (ECF Doc. 48-1, pp. 15-16.)  Plaintiff responds that the evidence is sufficient to support a finding that Mr. Mast orally agreed to the contract terms during a telephone conversation with Ms. VanDerWal and argues that the language of Ms. VanDerWal's follow-up email is "strong evidence that a deal had been reached."  (ECF Doc. 50, pp. 14-15.)  Defendants reply that Plaintiff's "allegation that the parties entered into an oral contract in a 6-minute telephone call on the morning of July 8, 2022 is merely a feeble attempt at creating a 'factual' dispute[.]"  (ECF Doc. 54, p. 12.)

Considering the totality of the circumstances and making all reasonable inferences in favor of the nonmoving party, the Court concludes that Plaintiff has presented sufficient evidence to establish a genuine dispute of material fact as to whether Mr. Mast and Ms. VanDerWal reached a meeting of the minds in their July 2022 telephone calls.

Mr. Mast agreed at his deposition that he and Ms. VanDerWal spoke by telephone on July 7 and 8, 2022, that Ms. VanDerWal quoted him a price of $1,538/ton, and that he told Ms. VanDerWal it was a good price.  (Mast Depo. at 79:7-8, 81:12-15, 83:7-10, 85:3-21.)  Mr. Mast also asserts that he told Ms. VanDerWal he would not sign anything without hearing from HBF, and that she told him she would send him a "quote" that would be good for ten days.  (*Id.* at 81:25-82:5.)  But Ms. VanDerWal testified, in contrast, that she and Mr. Mast "had a deal" by the time they concluded their telephone conversations, and that the terms of that deal were memorialized in the Sales Contract Confirmation.  (VanDerWal Depo., 80:3-8; 119:17-18.)

---

[2] The Court notes that Defendants' initial arguments appear to misconstrue the Complaint.  (*See* ECF Doc. 48-1, p. 15 ("Plaintiff alleges that her July 8, 2022 email constituted an offer (or contract)[.]").)  Plaintiff does not allege that Ms. VanDerWal's July 8 email or the Sales Contract Confirmation constituted an offer or that the parties' emails created a contract.  Rather, the Complaint alleges that Mr. Mast, on behalf of Granite Ridge, and Ms. VanDerWal, on behalf of SureSource, entered a verbal contract over the telephone on July 8, 2022, which was confirmed in writing when Ms. VanDerWal emailed the Sales Contract Confirmation to Mr. Mast.  (Compl., p. 3, ¶¶ 10-12.)

14

It is undisputed that Mr. Mast and Ms. VanDerWal had a six-minute telephone call on the morning of July 8, 2022 (ECF Doc. 49-6, p. 7), after which Mr. Mast emailed Ms. VanDerWal to request for a sample of soybean meal (ECF Doc. 48-2, p. 13).  It is also undisputed that Ms. VanDerWal emailed Mr. Mast at 3:31 pm that day saying her office would coordinate shipment of a sample, attaching a copy of the Sales Contract Confirmation, and further stating: "Please see attached contract. Please review, sign, and date at your earliest convenience. Thanks for your business! It means a great deal to me and my team!"  (*Id.* at p. 12.)  The attached Sales Contract Confirmation indicated that Plaintiff would supply Granite Ridge with 1,600 to 2,000 tons of soybean meal at $1,538/ton, to be delivered between October 1 and December 31, 2022.  (ECF Doc. 23-1, p. 1.)  The Sales Contract Confirmation also contained language stating that the buyer had an option to reject the contract by July 22, 2022, and explaining that a written rejection would make the contract "null & void," but that the contract was "valid" if not rejected.  (*Id.*)

Defendants argue that this evidence cannot support a meeting of the minds because the prior course of conduct between the parties—where Ms. VanDerWal emailed "quotes" that expired unless Mr. Mast responded—led Mr. Mast to believe that the July 8, 2022 email was "yet another quote" that required affirmative acceptance to be valid.  (ECF Doc. 54, pp. 8-9.)  But Ms. VanDerWal's July 8 email explicitly states that she has attached a "contract" for Mr. Mast to "review, sign, and date" and thanks Mr. Mast for his business.  (ECF Doc. 48-2, p. 12.)  The attached Sales Contract Confirmation has the appearance of a sales contract and explicitly states that it is valid unless rejected in writing by July 22, 2022.  (ECF Doc. 23-1, p. 1.)  The Court finds that the combination of Ms. VanDerWal's deposition testimony and the written communications, when viewed in the light most favorable to Plaintiff, could support a finding that the parties reached an oral agreement via telephone, the terms of which were later

15

documented in the Sales Contract Confirmation.  *See Cranpark, Inc. v. Rogers Grp., Inc.*, 498 F. App'x 563, 571 (6th Cir. 2012) (noting that "a plaintiff's deposition testimony submitted in response to a summary judgment motion may be sufficient to create a genuine issue of material fact") (citing *Harris v. J.B. Robinson Jewelers*, 627 F.3d 235, 239 (6th Cir. 2010)).

Defendants also argue that the evidence does not support a meeting of the minds as to the terms of the contract because Mr. Mast made it clear that he could not commit to a purchase until his potential customer had committed to a certain quantity.  (ECF Doc. 54, pp. 8-9.)  Certainly, Ms. VanDerWal testified that Mr. Mast told her he needed to obtain a commitment from HBF before committing to purchase soybean meal from SureSource.  (VanDerWal Depo., 79:21-25, 80:1-4; ECF Doc. 48-2, pp. 10-11.)   But the record contains evidence sufficient to support a finding that the parties agreed to contract terms that addressed Mr. Mast's concerns.  Ms. VanDerWal testified that she and Mr. Mast agreed in their July 8 call that Mr. Mast would have a specified amount of time to back out of the contract if he could not obtain a commitment from HBF.  (VanDerWal Depo., 79:23-80:3; 95:12-13, 119:15-18, 121:25-122:5.)  That "out" is included in the Sales Contract Confirmation.  (ECF Doc. 23-1, p. 1.)  Ms. VanDerWal also testified that she and Mr. Mast agreed to "a range of volume" because he did not know specifically what order he would receive from HBF.  (VanDerWal Depo., 79:21-25.)  Accepting this testimony as true and viewing the facts in the light most favorable to Plaintiff, Mr. Mast's stated desire to obtain a commitment from his customer before agreeing to a purchase does not preclude a finding that he agreed to the terms of the alleged oral contract.  *See CenTra, Inc. v. Estrin*, 538 F.3d 402, 412 (6th Cir. 2008) (". . . any direct evidence offered by the plaintiff in response to a summary judgment motion must be accepted as true.") (internal quotation marks and citations omitted)); *Sun v. CM Prods., Inc.*, 393 F. App'x 283, 287 (6th Cir. 2010) (citing

*Keweenaw Bay Indian Cmty. v. Rising*, 477 F.3d 881, 886 (6th Cir. 2007) ("Weighing of the evidence or making credibility determinations are prohibited at summary judgment—rather, all facts must be viewed in the light most favorable to the non-moving party.")).

Defendants' argument that Mr. Mast needed to test the samples before purchasing the product is also unavailing (ECF Doc. 54, p. 9), as they point to no evidence demonstrating that Mr. Mast could not agree to purchase soybean meal without testing it first. Indeed, Mr. Mast's request for samples—evidently the first in the parties' course of dealing—could alternately be construed as evidence supporting a finding that he had entered into an oral purchase agreement.

The above analysis is not impacted by Defendants' argument that Plaintiff's requests for Mr. Mast to sign the Sales Contract Confirmation reflected a belief that a valid contract would not be formed until that document was signed. (*See* ECF Doc. 48-1, p. 17; ECF Doc. 54, pp. 7-9.) Ms. VanDerWal testified that she understood sales contracts like the one she sent Mr. Mast to be enforceable without signature, and that many of her contracts were never signed. (VanDerWal Depo., 99:16-100:14.) SureSource's form sales contract also expressly states that it is enforceable without the buyer's signature, and the added terms in the Sale Contract Confirmation also reflect this expectation. (*See* ECF Doc. 23-1.) Ms. VanDerWal further explained that SureSource's organic certifier required signed contracts for their records, and that it was standard practice for SureSource's administrative assistant to follow up on all open contracts and request signatures, even though Ms. VanDerWal did not consider signatures necessary. (VanDerWal Depo., 102:17-103:7.) Thus, Plaintiff's various requests for Mr. Mast to sign the Sales Contract Confirmation would not preclude a finding, based on the totality of the record, that the parties reached an oral agreement on the terms of a sales contract via telephone, and that those contract terms were thereafter documented in the Sales Contract Confirmation.

Viewing the evidence in the light most favorable to Plaintiff, and considering all the relevant facts and circumstances, including Ms. VanDerWal's testimony, the wording of her email sending the Sales Contract Confirmation, and the contract terms set forth in the Sales Contract Confirmation, the Court finds that Plaintiff has demonstrated a genuine dispute of material fact as to whether the parties reached a meeting of the minds on the terms of the alleged oral contract.  The Court therefore turns to Defendants' argument that the alleged sales contract "could only be valid if Mr. Mast signed and returned the contract."  (ECF Doc. 54, p. 10.)

### 2. Plaintiff Has Demonstrated a Genuine Dispute of Material Fact as To Whether the Merchant Exception to the Statute of Frauds Applies

Under the OCC's statute of frauds, a contract like the one alleged in this case is not enforceable "unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker."  O.R.C. § 1302.04(A).  However, the OCC provides an exception to the statute of frauds where both parties to the contract are "merchants," as follows:

> Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of division (A) of this section against such party unless written notice of objection to its contents is given within ten days after it is received.

O.R.C. § 1302.04(B).  Plaintiff argues that both parties are "merchants" subject to this exception. (ECF Doc. 50, p. 16.)  Defendants do not dispute this contention, and largely do not comment on the applicability of the merchant exception in this case.  (*See generally* ECF Docs. 48-1, 54.)

The OCC defines a merchant as:

> a person who deals in goods of the kind or otherwise by the person's occupation holds the person out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by the person's employment of an agent or broker or other intermediary who by the agent's, broker's, or other intermediary's occupation holds the person out as having such knowledge or skill.

18

O.R.C. § 1302.01(A)(5).  Here, the record reflects that Ms. VanDerWal traded organic grain internationally for nine to ten years before founding SureSource.  (VanDerWal Depo., 19:15-17.) In her capacity as president of SureSource, she buys and sells grain commodities on the open market and sells grain feed, including extruded soybean meal, to farmers.  (*Id.* at 33:2-35:22, 35:13-15, 49:5-50:22.)  Annually, SureSource purchases 110,000 tons of soybeans and sells approximately 350,000 tons of soybean meal.  (*Id.* at 58:25-59:19.)   The record further reflects that Granite Ridge purchased and used around 3,500-4,000 tons of organic soybean meal in 2022.  (Mast Depo., 37:2-12.)   As the sole owner of Granite Ridge, Mr. Mast handles all large purchasing orders for the company and enters at least one or two contracts a year on Granite Ridge's behalf to purchase soybean meal for the company's own use.  (*Id.* at 10:8-10, 14:8-17, 35:1-11, 49:25-51:1).  He also contracts to purchase soybean meal as needed to make a feed mix that is sold to other farms.  (*Id.* at 19:4-14, 36:7-12; Mast Aff., p. 1, ¶ 4.)  The sale of mixed feed constitutes 10-15% of Granite Ridge's business.  (Mast Depo., 31:10-17.)

The Court finds that this evidence is sufficient to support a finding that both parties hold themselves out by their occupations "as having knowledge or skill peculiar to" the sale and purchase of organic soybean meal, or that "such knowledge or skill may be attributed" to them by their respective employment.  O.R.C. § 1302.01(A)(5).  Thus, the record supports at least a dispute of material fact as to whether the parties are "merchants."  Considering Defendants' failure to challenge or address the "merchant" designation in their briefing and construing the facts in the light most favorable to the non-moving party, the Court finds for the purposes of the present Motion that both parties are merchants.  *See* Fed. R. Civ. P. 56(e) ("If a party . . . fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for the purposes of the motion.").

19

While the statute of frauds generally requires that a sales contract be established via a "writing sufficient to indicate that a contract for sale has been made between the parties" and that the writing be "signed by the party against whom enforcement is sought," O.R.C. § 1302.04(A), the statute of frauds may be satisfied between "merchants" if the party against whom enforcement is sought receives "a writing in confirmation of the contract" "within a reasonable time" and "has reason to know its contents," unless that party gives "written notice of objection to its contents . . . within ten days after it is received," O.R.C. § 1302.04(B).

Although Defendants have offered no developed argument regarding the applicability of the merchant exception in this case, effectively waiving any such argument, the Court will nevertheless address the evidence relevant to its application.  As discussed in Section III.A.1., *supra*, the Court has found the evidence sufficient to support a finding by a reasonable jury that the parties reached an oral agreement regarding contract terms via telephone on July 8, 2022, and that those terms were later documented in the Sales Contract Confirmation that Ms. VanDerWal emailed to Mr. Mast that same afternoon, asking him to "see attached contract" and "review, sign, and date at your earliest convenience."  (*See* ECF Doc. 48-2, p. 12.)

Given that the evidence indicates a "writing in confirmation of the contract" was sent on the same day that the oral agreement was allegedly reached, the Court finds that the record supports a finding that Defendants received a writing in confirmation of the contract within a reasonable time.  O.R.C. § 1302.04(B).  The evidence is also sufficient to support a finding that that Mr. Mast did not provide "written notice of objection" to the terms documented in the Sales Contract Confirmation within ten days of receipt.  *Id.*  (*See* ECF Doc. 48-2, pp. 20-25 (text messages discussing Mr. Mast's failure to timely object to the Sales Contract Confirmation).)[3]

---

[3] The evidence likewise indicates that Mr. Mast did not object to the terms within the 14 days explicitly provided for in the written terms of the Sales Contract Confirmation.  (ECF Doc. 23-1.)

The final question to be addressed in assessing the applicability of the "merchant" exception is thus whether Defendants, as the party receiving the written confirmation of contract—i.e., the Sales Contract Confirmation—had "reason to know its contents."  O.R.C. § 1302.04(B).  Construing the evidence in the light most favorable to Plaintiff, the Court finds Plaintiff has presented sufficient evidence to support a finding that Mr. Mast had "reason to know" the material terms set forth in the Sales Contract Confirmation.

Ms. VanDerWal testified at her deposition that she and Mr. Mast agreed in the July 8 telephone call that SureSource would sell Granite Ridge 1,600-2,000 tons of soybean meal (VanDerWal Depo., 79:20-23, 80:12-15; 92:14-93:23) at $1,538/ton (*id.* at 79:17-25), and that Granite Ridge would have a range of time to get out of the contract (*id.* at 79:23-80:3; 95:12-13, 119:15-18, 121:25-122:5).[4]  Ms. VanDerWal sent the Sales Contract Confirmation to Mr. Mast mere hours after that conversation, and the document contains the same terms that she testified were orally agreed to by the parties.  (ECF Doc. 48-2, p. 12; ECF Doc. 23-1; ECF Doc. 49-6, p. 7.)  The same terms were also discussed in the parties' texts and emails on July 7 and 8, 2022.  (*See* ECF Doc. 48-2, pp. 10-15.)  Taking as true the evidence indicating that the parties reached an oral agreement to the terms in the Sales Contract Confirmation during their July 8 telephone conversation, and considering the language used by Ms. VanDerWal in forwarding the Sales Contract Confirmation to Mr. Mast—describing the document as an "attached contract," asking

---

[4] Ms. VanDerWal's testimony differed as to the length of the option period she and Mr. Mast discussed. (VanDerWal Depo., 95:12-13 (stating the parties agreed to ten days); *Id.* at 107:1-8 (giving a date that was 20 days from the alleged contract date).)  The Sales Contract Confirmation provides for a 14-day period.  (ECF Doc. 23-1 (giving the Buyer from July 8 to July 22 to reject the contract in writing).)  When confronted with the inconsistency between these dates, Ms. VanDerWal told Defendants' attorney that she had made a mistake.  (VanDerWal Depo., 107:7-8, 114:7-12, 118:8-21.)  Defendants make special note of these discrepancies, suggesting that they should influence the Court's decision regarding whether a contract was formed.  (*See* ECF Doc. 54, p. 7.)  To the extent Defendants are suggesting the Court should not credit Ms. VanDerWal's testimony due to these discrepancies, their assertion is not well-taken.  Ms. VanDerWal clarified that she was mistaken, and the Court may not weigh witnesses' credibility at this stage of the proceedings.  *See Sun*, 393 F. App'x at 287 (citing *Keweenaw Bay Indian Cmty.*, 477 F.3d at 886).

that he "review, sign, and date" the contract, and thanking him for his business—the Court finds Plaintiff has demonstrated a genuine issue of material fact as to whether Mr. Mast had reason to know the contents of the Sales Contract Confirmation.

This analysis is not changed by Defendants' underdeveloped argument that the Sales Contract Confirmation is not a confirmatory writing under the merchant exception. (ECF Doc. 54, p. 9.) Defendants assert, correctly, that while the "failure to object to a valid confirmatory writing eliminates a statute of frauds defense, it does not establish the existence of a contract," and the party who sends a confirmatory writing still bears the burden of persuading the trier of fact that an oral contract was formed. (*Id.* (emphasis omitted) (citing *Tubelite Company, Inc. v. The Original Sign Studio*, 176 Ohio App. 3d 241 (Ohio App. Ct. 2008); *American Bronze Corporation v. Streamway Products*, 8 Ohio App. 3d 223, 227-28 (Ohio App. Ct. 1982); Official Comment to U.C.C. § 2-201).) However, as discussed in Section III.A.1., *supra*, the Court has found that Plaintiff presented sufficient evidence to support a finding that an oral contract was formed. That having been established, Defendants do not offer any argument to suggest that the Sales Contract Confirmation is otherwise insufficient to satisfy the statute of frauds under the merchant exception. Although Defendants offer several arguments as to why Granite Ridge was not bound by the contract unless Mr. Mast signed it (ECF Doc. 54, pp. 7-10; ECF Doc. 48-1, pp. 15-17), they do not address the fact that the merchant exception makes Mr. Mast's signature on the contract irrelevant so long as the requirements of that exception have been met. *See* O.R.C. § 1302.04(B), O.R.C. § 1302.04, official comment 3. For the reasons set forth above, the Court finds Plaintiff has presented sufficient evidence to support a finding that the exception was met.

The Court therefore finds that Plaintiff has demonstrated a genuine issue of material fact as to whether the parties entered into an enforceable oral contract, and that the contract terms were later documented in writing consistent with the merchant exception to the OCC.[5]

### 3. Defendants' Additional Arguments Do Not Warrant Summary Judgment

Defendants also argue that summary judgment is warranted because Plaintiff did not perform on the alleged contract, and thus cannot show a breach of contract, and because Plaintiff failed to mitigate its damages by reducing its purchases of soybeans or finding another buyer for its soybean meal.  (ECF Doc. 48-1, pp. 17-19.)  The Court will address each argument in turn.

#### i. Plaintiff Has Demonstrated a Genuine Dispute of Material Fact as To Whether Defendants Breached the Alleged Contract

Plaintiff asserts that it was excused from performing on the alleged contract before seeking remedies for breach because Defendants repudiated the contract.  (ECF Doc. 50, pp. 18-20.)  Defendants do not respond to this argument in their reply brief.  (*See* ECF Doc. 54.)

Under Ohio law, "if a buyer 'repudiates the contract with respect to a performance not yet due,' the aggrieved seller may resort to any of the seller's remedies, including withholding delivery of the goods."  *D & S Mach. Prods., Inc. v. Thyssenkrupp Bilstein of Am., Inc.*, 434 F. App'x 446, 450 (6th Cir. 2011) (quoting Ohio Rev. Code § 1302.68(B); citing Ohio Rev. Code § 1302.77).  As the Sixth Circuit has observed: "It is not necessary for repudiation that performance be made literally and utterly impossible. *Repudiation can result from action which reasonably indicates a rejection of the continuing obligation*[.]"  *Id.* (quoting Ohio Rev. Code §1302.68, Official Comment 2) (emphasis in original).

---

[5] Having decided the Motion on these grounds, the Court need not address Plaintiff's additional argument that the contract is binding and enforceable under NGFA Trade Rules.  (ECF Doc. 50, pp. 17-18; ECF Doc. 54, pp. 10-11.)

Plaintiff correctly asserts that Mr. Mast's communications with Ms. VanDerWal reasonably communicated a rejection of the alleged contractual obligation.  On August 31, 2022, in response to a text message from Ms. VanDerWal asking for the "signed contract," Mr. Mast texted that there was a "misunderstanding," explaining: "I was on the meaning that I needed to sign the agreement by the end of the month (or whenever the date was) in order for the quote to be valid and if I don't sign and send back the offer within the time frame it's null and void." (ECF Doc. 48-2, p. 19-20.)  On September 15, 2022, in response to a text from Ms. VanDerWal stating that she would be "forced to move things over to [her] attorney," Mr. Mast responded that he did not sign the contract because he was not confident that he could hold up his end of the deal.  (*Id.* at pp. 23-27; Mast Aff., pp. 5-6, ¶¶ 42-43.)  After that, Mr. Mast said he had no further communications with SureSource or Ms. VanDerWal.  (Mast Aff., p. 6, ¶¶ 44, 48.)

Viewing the evidence in the light most favorable to Plaintiff, the Court finds that the evidence is sufficient to support a finding that Defendants repudiated the contract, putting Plaintiff in a position to withhold delivery of the goods and seek relief for breach of contract.

### ii. Plaintiff Has Demonstrated a Genuine Dispute of Material Fact as To Whether Plaintiff Suffered Damage as a Result of the Breach

In seeking summary judgment on the breach of contract claim, Defendants also assert that Plaintiff failed to mitigate its damages "[b]y waiting over 8 months to allegedly cover and mitigate damages," thus "turning a $31,856 lost profit case into a tort-like lottery ticket," and that Plaintiff "cannot establish that she sustained any damages."  (ECF Doc. 48-1, pp. 18-19.)  In their reply brief, Defendants further argue that Plaintiff's damages calculations fail to account for the expenses that were saved when Plaintiff did not have to pay to process the raw soybeans into soybean meal, again arguing that the "total profit" for performance of the contract would be $31,856 according to the calculations Plaintiff provided in discovery.  (ECF Doc. 54, pp. 13-14.)

Plaintiff responds that the measure of damages for Defendants' repudiation of the alleged contract is the difference between the contract price and the market price of soybean meal at the time for tender under O.R.C. § 1302.82(A).  (ECF Doc. 50, pp. 20-21.)  Plaintiff further observes that failure to mitigate damages is an affirmative defense that is not at issue in this motion, and that Defendants have failed to meet their burden of proof on that defense.  (*Id.* at p. 22.)

Under Ohio law, when a buyer repudiates a contract for the sale of goods, the aggrieved seller may, among other remedies, "withhold delivery of such goods" and recover damages in the amount of "the difference between the market price at the time and place of tender and the unpaid contract price together with any incidental damages . . . but less expenses saved in consequence of the buyer's breach."  O.R.C. §§ 1377(A) & (E), 1302.82(A).  Plaintiff asserts that the damages owed under this calculation may be as high as $485,152, depending on what is found to be the "time and place of tender," while Defendants assert that the proper calculation based on Plaintiff's discovery responses would be no more than $31,856.  (*Compare* ECF Doc. 50, pp. 20-21 *with* ECF Doc. 54, pp. 13-14.)

Regardless of the specific amount of damages that may ultimately be found to be supported by the evidence, it is clear following a review of applicable law, the evidence, and the arguments of counsel that Plaintiff has presented sufficient evidence to demonstrate on summary judgment that there is at least a question of material fact as to whether Plaintiff suffered damage as a result of the alleged breach of contract, precluding dismissal of the breach of contract claim.[6]

For the reasons set forth above, the Court finds Plaintiff has demonstrated a genuine issue of material fact as to: whether the parties entered into an enforceable contract that was

---

[6] Having decided the Motion on these grounds, the Court need not address Plaintiff's additional argument that the NGFA Trade Rules govern the calculation of damages.  (ECF Doc. 50, pp. 21-22.)

documented consistent with the merchant exception to the OCC; whether Defendants breached the contract through repudiation; and whether Plaintiff suffered damage as a result of that breach.

Accordingly, the Court **DENIES** Defendants' motion for summary judgment as to Count One of the Amended Complaint.

## B.    Count Two: Promissory Estoppel

In seeking summary judgment on Plaintiff's promissory estoppel claim, Defendants argue that the record does not support a finding that: Mr. Mast made a clear and unambiguous promise to purchase 1,600 tons of soybean meal from SureSource; it was reasonable and foreseeable for Plaintiff to rely on any such promise; and Plaintiff actually relied on the promise.  (ECF Doc. 48-1, p. 18.)  Plaintiff responds that there is at least a genuine dispute of fact as to whether the elements of promissory estoppel have been established in this case.  (ECF Doc. 50, p. 23.)

To prove promissory estoppel under Ohio law, a plaintiff must demonstrate: 1) a clear and unambiguous promise; 2) reliance upon the promise; 3) reliance that is both reasonable and foreseeable; and 4) injury as a result of the reliance.  *Cranpark, Inc.*, 498 F. App'x at 570 (citing *Current Source, Inc. v. Elyria City Sch. Dist.,* 157 Ohio App. 3d 765 (Ohio Ct. App. 2004)).

Turning to the first element—whether Defendants' alleged promise to purchase soybean meal from SureSource was "clear and unambiguous"—as discussed in Section III.A.1., *supra*, Plaintiff has presented evidence sufficient to support a finding that Defendants agreed to purchase 1,600 to 2,000 tons of organic soybean meal at $1,538/ton, to be delivered between October 1 and December 31, 2022, unless Mr. Mast voided the agreement in writing on or before July 22, 2022.  (*See, e.g.,* VanDerWal Aff., pp. 3-4, ¶ 15 (describing what Mr. Mast allegedly promised to do by telephone on July 8, 2022).)  Viewing the facts in the light most favorable to the non-moving party, the Court finds that a genuine issue of fact exists as to whether Defendants made a clear and unambiguous promise to purchase soybean meal.

Turning to the second element—whether Plaintiff relied on the promise—Defendants argue that SureSource did not actually rely on the alleged promise to purchase soybean meal because Ms. VanDerWal "indicated that she did not actually purchase the soybeans necessary to produce the soybean meal for Granite Ridge." (ECF Doc. 48-1, p. 18 (citing VanDerWal Depo., 109:18-25, 110:1-21; ECF Doc. 48-4, pp. 3-4).)  But Plaintiff presented evidence indicating that it does not purchase specific soybeans for specific contracts due to the nature of its business, and instead has a "rolling inventory" of soybeans that are regularly extruded into soybean meal and oil, which it then allocates to different buyers as their respective contracts require.  (VanDerWal Depo., 109:22-110:1, 128:14-129:8, 137:7-21.)  Ms. VanDerWal testified more specifically that she "booked the beans" once Mr. Mast promised to purchase 1,600 to 2,000 tons of soybean meal, meaning that she earmarked a portion of SureSource's soybean inventory for Granite Ridge at the alleged contract price of $1,583/ton.  (*Id.* at 109:18-110:21; *see also* VanDerWal Aff., pp. 2-4, ¶¶ 10, 17-18; ECF Doc. 48-4, p. 3.)  Relying on the value of that earmarked inventory, Ms. VanDerWal thereafter offered lower prices to subsequent buyers based on the fluctuating price of soybeans and soybean meal.  (VanDerWal Aff., pp. 2-3, ¶ 10.)  Viewing the facts in the light most favorable to the non-moving party, the Court finds that a genuine issue of fact exists as to whether Plaintiffs actually relied on Mr. Mast's alleged promise.

Turning to the third element—whether Plaintiff's reliance on the promise was reasonable and foreseeable—Defendants assert that any reliance on their alleged promise to purchase organic soybean meal from SureSource would have been unreasonable because Mr. Mast repeatedly told Ms. VanDerWal that he could not agree to purchase soybean meal without a more definite commitment from HBF.  (ECF Doc. 48-1, p. 18.)  However, as discussed in Section III.A.1., *supra*, Plaintiff presented evidence that the parties addressed Mr. Mast's stated

concerns by agreeing that Granite Ridge would have a period of time to void the agreed terms. (*See* VanDerWal Depo., 79:23-80:3; 95:12-13, 119:15-18, 121:25-122:5 (indicating that the parties discussed Mr. Mast's need for a commitment from HBF and included an opt-out provision in the contract); ECF Doc 23-1 (stating that the buyer, Granite Ridge, had 14 days to reject the contract in writing).)  Viewing the facts in the light most favorable to the non-moving party, the Court finds that a genuine issue of fact exists as to whether Plaintiff's reliance on Mr. Mast's alleged promise was reasonable and foreseeable.

For the reasons set forth above, the Court finds Plaintiff has demonstrated a genuine issue of material fact as to whether Plaintiff can establish all the elements of promissory estoppel.

Accordingly, the Court **DENIES** Defendants' Motion for summary judgement as to Count Two of the Amended Complaint.

### IV.    Conclusion

For the reasons set forth above, the Court **DENIES** Defendants' Motion for Summary Judgment.


IT IS SO ORDERED.


Dated:     April 7, 2025


   */s/ Amanda M. Knapp*
AMANDA M. KNAPP
UNITED STATES MAGISTRATE JUDGE